<u>A F F I D A V I T</u>

STATE OF WEST VIRGINIA

COUNTY OF _____, to wit:

I, M. T. Smith, being first duly sworn, do hereby depose and state as follows:

I. <u>INTRODUCTION</u>

A. <u>Background of Affiant</u>

1.     I, Sergeant M.T. Smith, graduated from West Virginia State University in May 1996, obtaining a Bachelor of Science Degree in Criminal Justice. I began my employment with the West Virginia State Police in October 1997, as a Cadet, and underwent physical, mental, and academic training relating to the skills associated with a law enforcement officer. I graduated from the West Virginia State Police Academy in March 1998, earning the rank of Trooper.

2.     I began my career in law enforcement as a Uniformed Field Trooper where I was a first responder, exposed to various situations and investigated a variety of crimes ranging from traffic offenses, to murders, burglaries, robberies, larcenies, and drug investigations.

3.     In October 2002, I requested and received assignment to the West Virginia State Police Bureau of Criminal Investigations. Here, I received additional training and experience focusing on drug investigations and more complex longer-term investigations. I also received experience in conducting controlled drug purchases with an informant and purchasing drugs

ATTACHMENT C

undercover. I have personally been involved with hundreds of drug investigations and undercover operations. The types of drugs operations conducted varied from street level operations/investigations to multi-person conspiracies involving traditional drugs such as cocaine, cocaine base, marijuana and heroin. I have also obtained experience and training in the area of pharmaceutical drugs, such as Oxycodone, Hydrocodone, Xanax, Valium and other types of prescription drugs. I have also been involved in investigations that involved healthcare officials prescribing outside their course of practice.

   4.    Some of the academic courses that I have completed since being assigned to the West Virginia State Police Bureau of Criminal Investigations include:

Basic Drug Investigations Training by U.S. Army CID, WVSP Academy 11/18/2002 – 11/22/2002

Drug Diversion Training by the Virginia State Police, WVSP Academy, 2/4/2003   – 2/6/2003

Clandestine Laboratory Training by HIDTA, Newport, TN, 4/6/2003 – 4/12/2003

Site Safety Clandestine Laboratory Training, DEA Academy - Quantico, VA, 10/20/2003 – 10/23/2003

Undercover Survival /Street Tactics Training by HIDTA, London, KY, 8/17/2004 – 8/19/2004

Prosecuting Drug Cases by the National College of District Attorneys, New Orleans, LA, 10/30/2004 – 11/4/2004

2

Financial Investigative Techniques, London, KY, 7/11/2005 – 7/13/2005

Advanced Undercover and Survival Training by HIDTA, Lexington. KY, 7/31/2005 – 8/4/2005

Pharmaceutical Drug Investigations, Hazard, KY, 5/14/2006 – 5/15/2006

Drug Diversion Training, DEA Academy, Quantico, VA, 8/14/2006 – 8/18/2006

Hostage Negotiations Training by the FBI, WVSP Professional Development Center, 4/21/2008 – 4/25/2008

Undercover Operation Training by HIDTA, WVSP Professional Development Center, 10/7/2008 – 10/8/2008

  5.  I have also served as a training officer to new members assigned to the Bureau of Criminal Investigations. I am also the instructor of the Drug Identification and Handling Course taught at the West Virginia State Police Academy, and have taught courses relating to drug investigations in yearly in-services training and assisted in the training of the Basic Drug Investigation Course taught to multiple agencies by the West Virginia State Police. I have also taught courses to law enforcement on the topic of prescription drug diversion.

  6.  I have received Special Deputation through the United States Marshals Service and the Federal Bureau of Investigations to seek and execute, arrest and search warrants, and to also monitor Title III intercepts.

  7. The information contained in this affidavit has been obtained by or provided to me by individuals knowledgeable of the subject matter, including others in law enforcement who have provided me with information they have obtained during the ongoing investigation. Therefore, this

affidavit does not include every fact gathered during the course of this investigation, but simply includes selected facts needed to obtain the probable cause to obtain search warrants for:

(a) Katherine A. Hoover's Residence, Lost Creek, Harrison County, West Virginia.

B. Nature of Investigation

8.  The Drug Enforcement Administration (DEA), the West Virginia State Police (WVSP), the Department of Health and Human Services/Office of the Inspector General (DHHS/OIG), and the FBI are conducting an ongoing criminal investigation of the Mountain Medical Care Center, LLC, (Mountain Medical) (previously known as the Williamson Wellness Center (WWC)) located at 35 West Third Avenue in Williamson, West Virginia. I know from my personal observation and from my review of documents and statements of others, that Katherine Hoover M.D., William Ryckman, M.D., and J. Victorio Teleron, Jr., M.D., are/were physicians practicing at Mountain Medical. Investigation indicates that Dr. Hoover, Dr. Ryckman and Dr. Teleron have unlawfully distributed controlled substances to patients through Mountain Medical. The investigation has also revealed that Myra Miller, Camille Heslel, and other employees of Mountain Medical, conspired with the above named physicians, and others in unlawfully distributing and obtaining the controlled substances and in committing health care fraud.

9.  This activity may constitute the following and other criminal violations:

(a) 21 U.S.C. § 846(a)(1), conspiracy to distribute controlled substances;

(b) 21 U.S.C. § 841(a) (1), distribution of controlled substances;

4

(c)  21 USC § 843 (a) (2), use of a registration number issued to another person to distribute controlled substances;

(d)  21 U.S.C. § 843(a)(3), obtaining controlled substance by fraud;

(e)  18 U.S.C. § 1347, health care fraud; and

(f)  18 USC § 2. aiding and abetting.

WILLIAM F. RYCKMAN, M.D.

10.  According to the West Virginia Board of Medicine website,  Dr. Ryckman's preferred mailing address as 127 American Lane, Sutersville, Pennsylvania. He does not list a current work address. Dr. Ryckman attended medical school at the State University of New York at Buffalo School of Medicine and Biomedical Science. His primary specialty is listed as a family practice. He has an active medical license with the state of West Virginia.  His license was originally granted in March of 1997.    Investigation confirmed that Dr. Ryckman resides at 127 American Lane, Sutersville, Pennsylvania.

11.  On June 8, 2004, the West Virginia Board of Medicine entered into an agreement with Dr. Ryckman.  This agreement was a result of a complaint of improper prescribing practices made on June 1, 2002, by Michael Burton, R.Ph. The complaint alleged that Dr. Ryckman, while living in the State of Pennsylvania, was telephoning controlled substance prescriptions to pharmacies in West Virginia and Kentucky for patients who were being seen by a Physical Therapist at Ryckman's office in Williamson, West Virginia.

12.  Upon receiving the aforementioned complaint, the West Virginia Board of Medicine initiated an investigation and secured the services of an independent physician. This physician

reviewed ten (10) of Dr. Ryckman's patient files covering the periods of 2001 through 2002. The physician found that all of these patients were diagnosed as "chronic non-malignant pain patients." A report generated by the independent physician on May 14, 2003, outlined concerns that Dr. Ryckman offered little or no follow up re-evaluation on subsequent office visits, no evidence of x-ray reports, or special testing. All patients were seen on a monthly basis apparently for the sole purpose of renewing prescriptions for federally scheduled narcotics. The physician reviewed pharmacy printouts for Ryckman's patients and concluded that they were filling an "astronomical" amount of narcotic prescriptions. The reviewing physician formed the opinion that Dr. Ryckman failed to follow the guidelines of the West Virginia Board of Medicine for the use of opioids in the treatment of chronic "non-malignant" pain. The West Virginia Board of Medicine also concluded that Dr. Ryckman's record-keeping was inadequate to justify the course of treatment, and his prescribing practices, specifically controlled substances, were below the recognized standard of care.

13. As a result of the reviewing physician's report and the West Virginia Board of Medicine's findings, a Consent Order was filed on June 8, 2004. This Consent Order outlined the fact that Dr. Ryckman was publicly reprimanded for over prescribing narcotics to his patients, for deficiencies in medical diagnosis, treatment, and medical care. Dr. Ryckman was ordered to pay the State of West Virginia a civil fine in the amount of $2,500.00. Lastly, the Order directed Dr. Ryckman to successfully complete an intensive course in record keeping, and an intensive course in controlled substance management, at his own expense. Dr. Ryckman was also ordered to provide documentation confirming that he had successfully completed the said courses.

KATHERINE A HOOVER, M.D.

6

14.  According to the West Virginia Board of Medicine website, Dr. Hoover's preferred mailing address as Route 2, Box 203, Lost Creek, Harrison County, West Virginia. Investigation verifies that this is her home address. Her primary work location is listed as Mountain Medical Care Center, 35 West 3rd Avenue, Williamson, West Virginia. (The investigation indicates that Dr. Hoover's primary residence is the Lost Creek address and that she generally resides there with her husband from Friday until Monday. She shares an apartment with Dr. Diane E. Shafer, at 114 West Second Avenue, Williamson, West Virginia during her work week. That apartment is accessed through 114 West Second Avenue, but is also partially contained within the attached building. Dr. Shafer is under investigation for conduct similar to that discussed herein. In December 2009, Dr. Shafer voluntarily surrendered her DEA registration and West Virginia medical license. ) Dr. Hoover attended medical school at the Michigan State University College of Human Medicine. Her primary specialty is listed as internal medicine. She has an active medical license with the state of West Virginia. She first obtained her license in July of 1978.

15.  On November 10, 2004, charges were filed against Dr. Hoover by the West Virginia Board of Medicine, in an amended complaint, alleging that, in October of 1995, Dr. Hoover while performing a gynecological exam on a seventeen year old patient, asked the patient if she and her friends would be willing to come to her home and have sex with her teenage sons. Dr. Hoover denied the allegations.

16.  The hearings related to this complaint not only validated the complaint, but evidence surfaced that a letter allegedly written by a medical assistant who worked at the clinic where Dr. Hoover was seeing the patient, was actually written by Dr. Hoover. This letter was written to make Dr. Hoover look more favorable during the hearing.

17.   In October of 2008, Dr. Hoover's license to practice medicine was put on probation for five (5) years. Dr. Hoover is only allowed to practice under the supervision of one or more physicians that were approved by the board.

### J. VICTORINO R. TELERON, JR., M.D.

18.   According to the West Virginia Board of Medicine website, Dr. Teleron's preferred mailing address 250 Whispering Woods Road, Charleston, West Virginia, which is also his home address. His primary work location is listed as 35 West 3rd Avenue, Williamson, West Virginia. Dr. Teleron attended medical school at the University of the Philippines, School of Medicine. His primary specialty is listed as internal medicine. He has an active medical license with the state of West Virginia. He first obtained his license in January of 1982.

### C. Controlled Substance Violations

19.   At all relevant times, Dr. Hoover possessed a valid DEA registration in West Virginia and was authorized to prescribe controlled substances.  The current location of her registration is 35 West Third Avenue, Williamson West Virginia. At all relevant times Dr. Ryckman possessed a valid DEA Registration in West Virginia and was authorized to prescribe controlled substances. The current location of his registration is 35 West Third Avenue, Williamson, West Virginia. In approximately August 2008, Dr. J. Victorino Teleron began his employment at the Mountain Medical Care Center. From August 11, 2008, Teleron was registered with DEA at 35 West Third Avenue in Williamson, West Virginia, and was authorized to prescribe controlled substances.

20.    A physician who wishes to possess, distribute, dispense, or prescribe controlled substances as part of his or her professional practice must do so pursuant to a DEA registration (21

U.S.C. § 822; 21 C.F.R. 1301.11). A prescription for a controlled substance must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. 21 C.F.R. 1306.04(a). It is a violation of 21 U.S.C. § 843(a)(2) to use a DEA registration number issued to another person to distribute controlled substances.

21. A physician violates 21 U.S.C. § 841 (unlawful distribution of controlled substances) when: (a) the physician distributes or dispenses a controlled substance; (b) the physician acts knowingly and intentionally; and (c) the physician's actions are not for a legitimate medical purpose in the usual course of his professional medical practice or are beyond the bounds of medical practice. (United States v. Singh, 54 F. 3d 1182, 1186 ).

22. The term "controlled substance" means a drug or other substance included in Schedules I, II, III, IV and V as contained in 21 U.S.C. § 812 and 21 C.F.R. 1308.11, 12, 13, 14 and 15.

23. The term Lortab is a trade name for hydrocodone a schedule III controlled substance.

24. The term Xanax a trade name for alprazolam a schedule IV controlled substance.

25. Both hydrocodone and alprazolam are popular drugs of abuse that are commonly obtained by fraud, diverted and sold on the streets for a profit. Taken together they can produce a heightened affect for the drug user/abuser.

26. The term "distribute" means to deliver (other than by administering or dispensing) a controlled substance 21 U.S.C. § 802(11). This includes issuing prescriptions.

II. INVESTIGATION

9

27.  Your affiant has knowledge from numerous patients of Mountain Medical, and through undercover visits to Mountain Medical, that the standard operating procedure regarding the prescribing of controlled substances used at the clinic is as outlined below.

28.  A patient making his initial visit to the clinic is charged four hundred and fifty dollars. The cost of the visits has increased over the years.  Medicaid and Medicare are not accepted.   A majority of patients pay for their office visits with cash.  On the patient's first visit he is seen by a practitioner.  The majority of patients receive the same prescriptions (hydrocodone and alprazolam). It is generally requested that the patient obtain an MRI or X-Ray. All controlled substance prescriptions are called-in by the clinic and the patient is given a list of approved locally owned pharmacies located in West Virginia and Kentucky from which he may choose for his call-in to be placed. No re-fills are given on controlled substance prescriptions and patients are required to visit the clinic each time a prescription is needed. On subsequent visits the patient generally does not see a practitioner.  Instead, the patient is simply asked by the receptionist if his complaint is still the same and if he has had any changes since the last visit. The patient's vital signs are taken and he is asked if he wants to see a practitioner.  If the patient states that his complaint is the same and does not want to see a practitioner a prescription is called in for the same controlled substances as obtained during the previous visit. The patient is required to pay one hundred and fifty dollars for the follow up visits. In 2009, the clinic called in controlled substance prescriptions for approximately 175 patients per day, assuming a five day work week, fifty weeks a year.

COURT TESTIMONY

29. The following individuals provided  testimony on the record in the Mingo County West

10

Virginia Circuit Court. These individuals testified that they received their controlled substances from Mountain Medical. The individuals also described their experiences with Mountain Medical below:

(a) ████████████ testified on March 6, 2003, that he received Lortabs and Xanaxes from Dr. Ryckman. ████ advised that he did not have any type of CT Scans, x-rays, or blood work performed at Mountain Medical. Instead, he told Dr. Ryckman that he had lower back pain and headaches. ████ added that he did not see a physician on every visit, but would instead have the prescription called in by someone at Mountain Medical.

(b) ████████ testified on March 6, 2003, that he obtained controlled substances from Dr. Ryckman. ████ obtained these controlled substances after explaining to Dr. Ryckman that his back and head hurt. Dr. Ryckman did not perform any type of testing to determine what caused ████ pain. ████ also testified that Dr. Ryckman was not at the office during half of his office visits.

(c) ████████ testified on March 24, 2005, that he was addicted to Hydrocodone and received his prescription from Dr. Hoover at Mountain Medical for approximately three years. ████ advised that he did not have any type of diagnostic testing conducted while under the care of Dr. Hoover, and only saw Dr. Hoover five or six times during the three year time period. Mountain Medical patients are generally required to at least visit the clinic once a month in order to continue receiving their prescriptions.

(d) ████████ testified on March 5, 2009, that he has been a patient of Dr. Hoover for approximately three years. He testified that he saw Dr. Hoover on his first visit and approximately five more times over a three year time period. Again, it should be noted that Mountain

Medical patients are generally required to visit the clinic and pay $150 at least once a month, in order to continue receiving their prescriptions.

(e) ███████████ testified on March 9, 2009, that he has been Dr. Hoover's patient for approximately eight years. ███████ has gone an entire year without seeing Dr. Hoover. ███████ would go to Mountain Medical and see one of the receptionist who he would pay for his office visit. He would then be called back, weighed, and have his blood pressure taken. He would then be asked if his medication was working, and where he wanted to fill his prescription. ███████ would use his month's worth of prescribed medication in under a week. ███████ was required to pay for an office visit once a month.

(f) ███████████ testified on April 2, 2009, in criminal court Mingo County, West Virginia, where he was charged with selling his prescription medication. ███████ testified that the hydrocodone he was selling was prescribed by Dr. Hoover. ███████ advised that he would pay one hundred fifty dollars ($150.00) per office visit. After waiting fifteen to twenty minutes, his name would be called. He then would have his blood pressure taken, he would be weighed, and he would be asked a couple questions. ███████ estimated this meeting with staff lasted approximately five (5) minutes. He advised that he was receiving ninety (90) hydrocodone and thirty (30) Valium tablets. He advised that he saw Dr. Hoover maybe one time in two years.

(g) ███████████ testified on April 2, 2009, that she was receiving hydrocodone from Dr. Hoover as well as other physicians. ███████ added that she had to see a physician other than Dr. Hoover because Mountain Medical did nothing more than check your weight and blood pressure, and then call in your prescription. Records from the West Virginia Board of Pharmacy

12

indicated that during a three (3) year time period ████████ has obtained hydrocodone and Xanax from multiple physicians while receiving the same type of medication from Dr. Hoover.

(h) Along with the aforementioned individuals, the following individuals also provided relevant testimony regarding their experiences as "patients" with Mountain Medical:

Court testimony:



WITNESS STATEMENTS

30. On Thursday, April 23, 2009, ████████████ was interviewed. She advised that she had obtained prescriptions for hydrocodone and diazepam, also known as Valium, a schedule IV controlled substance, from Dr. Hoover from 2003 to 2007 at the WWC. ████████ advised that she had heard through a friend you could visit WWC, say you had an injury, and receive hydrocodone. ████████ advised that on her first visit she paid two hundred fifty dollars ($250.00) and filled out a large amount of forms. She stated she then had her vitals taken and waited to see the doctor. ████████ advised that she saw Dr. Hoover and told her that she had hurt her back at work and wanted pain medication. Dr. Hoover conducted a short exam and engaged her in conversation about her personal life. ████████ advised she was then called in prescriptions for hydrocodone and diazepam.

31. ████████ advised that she would travel from Barboursville, West Virginia, to WWC once a month and pay one hundred fifty dollars ($150.00). The round trip would normally take in excess of three hours. (It was common for individuals to travel long distances to visit Mountain Medical.) ████████ advised that she would then have her vitals taken and meet with a person believed to be a nurse. She stated she would also be asked what her pain was on a scale of 1-10 ████████ advised that

13

she would then have the same prescriptions called in to a pharmacy and she would pick them up.

32. ▓▓▓▓ advised that she never obtained an X-Ray or MRI while being seen from 2003 to 2007. She estimated that she saw Dr. Hoover three times. ▓▓▓▓ advised she was not placed on any type of treatment plan other than receiving prescriptions.

33. ▓▓▓▓ advised that most people are aware that WWC is a "pill mill" and that in her opinion a patient was simply providing cash in exchange for prescriptions. She described the office's practice as "like herding cattle through a process". She advised the staff was constantly hurrying to cycle individuals though the process. She stated she observed numerous individuals completing the same process to obtain prescription drugs, mainly Hydrocodone. ▓▓▓▓ advised that it was obvious most of the patients at WWC were drug seekers and the office was set up to provide them with those drugs. ▓▓▓▓ advised that she also overheard individuals discussing selling their prescriptions while she was attending the office.

34. On April 20, 2006, a complaint was received by the DEA from ▓▓▓▓ of ▓▓▓ KY. ▓▓▓▓ registered nurse employed through ▓▓▓▓ indicated that a relative of hers, ▓▓▓▓ was receiving controlled substance prescriptions from the WWC and was addicted to, and abusing pharmaceuticals ▓▓▓▓ indicated that ▓▓▓ had been going to the WCC for approximately three years and obtaining prescriptions. ▓▓▓▓ indicated that about four years ago ▓▓▓ had an accident where she hurt her ankle. She was also involved in two auto accidents. ▓▓▓▓ did not believe that ▓▓▓ was receiving the controlled substance prescriptions pursuant to a valid medical need. ▓▓▓▓ indicated that ▓▓▓ had been arrested on several occasions for DUI of prescription medications and had been involved in accidents while

14

under the influence of the prescription medications. ███████ indicated that the last accident had

occurred approximately one week ago. The accident involved a four wheeler and that ██████ had

been arrested for DUI regarding the prescription medication she obtained from the WWC.

███████ indicated that ████████ had gone through a drug rehab program in November of 2005, but

was still receiving prescriptions through the WWC. ████████ stated that she had contacted the

WWC by telephone five or six times within the past two years in an attempt to talk with a doctor to

pass on the information regarding ████████ drug abuse problem. ████████ stated that she spoke with

a receptionist on each occasion (name unknown) and was told that the information would be passed

on to the doctor ████████ stated that she was not allowed to talk to the doctor. When asked about

other individuals from her community going to the WWC, ████████ indicated that the whole county

goes there because it is known as the place to get drugs.

35. On November 28, 2005, a telephone call was received at the DEA from an individual

identifying himself as ████████ of ████████████ called to complain about the WWC

located in Williamson, West Virginia and the lack of care he had received at the center. ████████

indicated that while he had visited the WWC on numerous occasions, (receiving controlled substance

prescriptions) he had only seen a doctor on one occasion.

36. ████████ indicated that he was under total disability through West Virginia workers'

compensation for leg problems and a back injury ████████ indicated that he had first seen Dr. William

Ryckman in approximately 1996, when Ryckman was practicing with Dr. Diane Shafer in

Williamson, West Virginia. ████████ stated that when the WCC opened a few years ago he started

treatment there ████████ indicated that he paid $450 on his first visit and saw Dr. Katherine Hoover,

but on subsequent occasions he saw office staff (Mary LNU, Myra Miller) who weighed him and

15

took his blood pressure and would then call in prescriptions for him (Hydrocodone and Alprazolam). ████ stated that some prescription bottles had listed Donald Kiser, MD as the prescribing physician but that ████ had never seen Dr. Kiser. Your affiant is aware that Dr. Kiser was a doctor employed at the WWC. ████ stated that all prescriptions were called in to the Food City Pharmacy in South Williamson, Kentucky. ████ indicated that he had stopped going to the WWC approximately four months ago.

37. A statement was taken from ████████ of Delbarton, West Virginia, by the West Virginia State Police on January 18, 2008. ████████ indicated he had been a patient of Dr. Hoover's since January of 2005 for a back injury. ████████ stated that Dr. Hoover examined him during his first visit and wrote him prescriptions for Valium and hydrocodone. ████████ was asked to pick from a list of four pharmacies where he would like to fill his prescriptions. Following the initial visit, ████████ stated that for the next eight to ten months he would go to the office every two weeks. On these visits he would not see a doctor but would simply have his blood pressure taken and the office would call in prescriptions for him. ████████ stated that he was not getting better so requested to see a doctor. ████████ stated that when he asked to see a doctor the staff would get irritated and make him wait three to four hours before he could see Dr. Hoover. The last time ████████ saw Dr. Hoover, she got mad and asked why he wanted to see her. ████████ told her that he wanted to know why his back was hurting in a different area than it did originally. During ████████ last visit to the office he asked to see Dr. Hoover and got in an argument with "Myra". Your affiant believes "Myra" to be Myra Miller, Mountain Medical's office manager.

38. According to ████████ "Myra" told him that he was being treated for a shoulder injury and not a back injury. ████████ thought that this was said as a way to get rid of him. ████████

16

stated that "Myra" told him that Dr. Hoover would not be seeing him anymore and threw ████████ out of the office. When ████████ returned the next day, Dr. Hoover would not see him and was referred to another doctor in Pikeville, KY. ████████ indicated that people in the area suggest that you go to Dr. Hoover's office (Mountain Medical) because she will write prescriptions and that Dr. Hoover's office (Mountain Medical) is simply a "pill mill."

39.  Along with the aforementioned individuals, ████████ also provided statements regarding his experience as a "patient" with Mountain Medical.

40.  On or about January 20, 2006, members of the West Virginia State Police arrested ████████ and ████████ for fraudulently obtaining controlled substances (hydrocodone) from WWC while receiving the same or similar drugs from other physicians (doctor shopping).

(a) ████████ was interviewed on January 20, 2006. He advised that he was obtaining Hydrocodone from multiple physicians and was addicted to the same. Stevenson advised he was referred to the WWC due to a knee injury ████████ advised that he had been going to the clinic for one to two years ████████ advised he saw Dr. Hoover during his initial office visit and that she asked him questions and looked at his knee ████████ estimated that this meeting took less than fifteen minutes ████████ advised he then picked one pharmacy from a list of several provided by the clinic and was called in Hydrocodone and Xanax ████████ advised that he did not ask for the Xanax. ████████ advised that he then returned each month and went to what he described as a "bank teller window" ████████ advised he would then provide a lady his name and date of birth. ████████ would pay the "teller" cash and wait for his name to be called out over the loud speaker.

17

Stevenson advised that he would have his weight and blood pressure taken ████████ would then pick his prescriptions up at the predetermined pharmacy ████████ advised that he was told by Dr. Hoover that the prescriptions were the only treatment that he would receive at this location. ████████ advised that he also asked the staff why other doctor's names that he had not seen such as Dr. Ryckman and Dr. Kiser were on the prescription bottles. ████████ was told that it was fine because it was a group of doctors.

    (b) On January 20, 2006, ████████ was interviewed pursuant to his arrest for obtaining a controlled substance by fraud. ████████ recalled that approximately (6) six or (7) seven years prior to this interview he received a hip injury. ████████ was referred to Dr. Hoover at Williamson, West Virginia, during treatment for that injury. Upon the first visit to Dr. Hoover, ████████ advised that she sent him for an MRI and gave him a "check up." ████████ advised that he then continued to visit Dr. Hoover's office approximately once a month over a (4) four to (5) five year period. During that time period ████████ stated that he was "questioned by and saw a doctor" on approximately three to four occasions. ████████ stated that during a majority of the visits to Dr. Hoover, he was generically evaluated by a nurse who would write down his "weight and blood pressure" prior to calling in a refill for his prescriptions at Family Discount Pharmacy in Logan, West Virginia. The prescriptions were for hydrocodone and Alprazolam. ████████ stated that it was his understanding that patients went to Dr. Hoover and received refills while rarely being seen by a doctor. ████████ stated, "It's obvious that everybody now goes there for pills."

    (c) Along with the aforementioned individuals, the following individuals were arrested for "doctor shopping" and provided statements regarding their experiences as "patients" with Mountain Medical:

18



41 . According to the WV Pharmacy Board prescription monitoring program, ▮▮▮ also known as ▮▮▮ has received numerous controlled substances via prescriptions authorized by physicians who are working at or have worked at, Mountain Medical. ▮▮▮ is the ▮▮▮ ▮▮▮ The physicians whose names are on ▮▮▮ prescriptions include:

> Donald Kiser
> William Gorby (now deceased)
> Katherine Hoover
> V. Teleron
> William Ryckman

42. Generally, the clinic did not prescribe schedule II substances. However in the case of ▮▮▮ a large number of schedule II controlled substances were prescribed (Oxycodone, Duragesic, Demerol, Fentanyl). Additionally, pharmacy reports indicate that ▮▮▮ has received Subutex prescriptions from both Dr. Teleron and Dr. Ryckman. Both authorized Dr. Teleron and Dr. Ryckman to prescribe subutex for drug treatment. Subutex is a brand name for Buprenorphine, a Schedule III controlled substance, also sometimes known as "Suboxone."

43. Pharmacy Board information indicates that Dr. Hoover has also prescribed Subutex to ▮▮▮ although Hoover is not approved to dispense/prescribe for drug treatment. Physicians are

19

required to keep a record of the Subutex prescribed for drug treatment. 21 CFR 1304.03 (c). This can be kept in the individual patient chart.

44.     Some of the prescriptions reflected in ███████ pharmacy records indicate that he may have also obtained drugs by fraud from physicians outside Mountain Medical.

45.     Note: the United States is mindful of the provisions of 42 U.S.C. § 2 and seeks patient records which may contain drug treatment information in accord therewith, as the need for the information outweighs the potential injury to the patients. Further, the United States recognizes that special care must be taken with patient records reflecting "drug treatment" and that there are limitations on the use of such records. For example, they may not be used in a criminal investigation against the patient. The United States plans to treat "drug treatment" patient records as if they were grand jury material in this investigation, and would not disclose such records to individuals outside the investigation without a court order.

46. According to the West Virginia Board of Pharmacy Prescription Monitoring Program, ███████ has received numerous controlled substances from prescriptions authorized by Dr. Katherine Hoover, and Dr. William Ryckman, beginning in July of 2005 through June of 2009.



West Virginia Board of Pharmacy Reports

47. On September 1, 2002, the West Virginia Board of Pharmacy (WVBOP) implemented a program where a central repository was established and maintained all Schedule II, III, and IV

controlled substance prescriptions written or filled in the state of West Virginia, as reported by the pharmacies filling the prescriptions.

48. Agents obtained WVBOP reports for Drs. Hoover, Teleron, and Ryckman listing all controlled substances prescriptions written and filled for the relevant time periods. Those reports were then summarized showing the number of individuals receiving prescriptions each day.

49. Those summary reports showed that there were days when over 400 individuals filled prescriptions on one given day. Agents then ascertained the three days with the highest number of individuals who had prescriptions issued by Dr. Hoover and obtained a 2.5 % random sample of all individuals who received controlled substances. Agents also prepared lists showing the two days with the highest number of individuals who had prescriptions issued by Drs. Teleron and Ryckman and obtained a 2.5% random sample of those individuals who received controlled substances.

50. On Friday, November 30, 2007, 454 individuals filled controlled substance prescriptions under Dr. Hoover's name and DEA number. A 2.5% sample or 11 of those individuals were randomly selected. They are: