


51. On Wednesday, January 2, 2008, 458 individuals filled controlled substance prescriptions under Dr. Hoover's name and DEA number. A 2.5% sample or 11 of those individuals were randomly selected. They are:



52. On Monday, January 5, 2009, 444 individuals filled controlled substance prescriptions under Dr. Hoover's name and DEA number. A 2.5% sample or 11 of those individuals were randomly selected. They are:




53. On Wednesday, October 1, 2008, 269 individuals filled controlled substance prescriptions under Dr. Teleron's name and DEA number. A 2.5% sample or 6 of those individuals were randomly selected. They are:



54. On Friday, October 30, 2009, 248 individuals filled controlled substance prescriptions under Dr. Teleron's name and DEA number. A 2.5% sample or 7 of those individuals were randomly selected. They are:





55. On Monday, September 22, 2008, 163 individuals filled controlled substance prescriptions under Dr. Ryckman's name and DEA number. A 2.5% sample or 5 of those individuals were randomly selected. They are:



56. On Friday, November 20, 2009, 153 individuals filled controlled substance prescriptions under Dr. Ryckman's name and DEA number. A 2.5% sample or 4 of those individuals were randomly selected. They are:



UNDERCOVER VISITS

57. Undercover (UC) visits have verified the information provided through public complaints and other sources of information. Below is a summary of those visits:

A. August 16, 2005

58. The UC officer [redacted] of the WVSP [redacted] entered the facility and approached the receptionist and was told the cost of the office visit would be four hundred and fifty dollars. Along with a patient questionnaire, the UC was given a narcotic contract prior to any conversation with a doctor. The UC indicated on the questionnaire that he had headaches and back pain. The UC then waited in the reception area to be called. While in the reception area, the UC spoke with another individual who was waiting who stated that Dr. Hoover was the one to see for pills, and that they (WWC) were going to require that the UC have an x-ray in order to cover themselves. After waiting approximately one hour the UC was weighed and his blood pressure taken and questions asked about his complaint. The UC then returned to the waiting area. After waiting another hour the UC was called to an exam room where an individual (believed to be Camille Swanson Helsel, a nurse practitioner) reviewed the UC's questionnaire and asked the UC how much pain he has on a scale of one to ten. Helsel indicated the number eight to which the UC agreed. Helsel listened to the UC's heart and lungs and had the UC bend over and twist. Helsel then left the exam room and talked with an individual believed to be Dr. Hoover in the hallway. Helsel told Dr. Hoover that the UC has good mobility and some pain when bending over. Dr. Hoover entered the room and asked the UC what he wanted to get back to doing to which the UC stated, "construction." Hoover then told the UC that he needed to exercise and gave the UC a photocopy of a list of exercises. Dr. Hoover then left the room. Helsel gave the UC a prescription for an x-ray with a diagnosis of lumbar sprain. Helsel asked the UC which pharmacy he wanted to use to which the UC responds, "the Wal-Mart in Logan." Helsel responded that they didn't use that pharmacy, and the UC could fill his prescriptions at either the Family Pharmacy in Logan or Hurley's which was down the street. The UC indicated Hurley's. Helsel then advised the UC that the clinic would call

in a prescription to Hurley's and the UC could make another appointment up front. The UC subsequently filled the prescription which had been called in under the authorization of Dr. Katherine Hoover for ninety 7.5/500 hydrocodone, which were to be taken one tablet, three times per day.

B. SEPTEMBER 14, 2005

59. The UC informed the receptionist that he was there to get his prescription. The receptionist told the UC that the fee was one hundred and fifty dollars which the UC paid. After waiting approximately one hour, the UC has his blood pressure and weight taken by an unidentified female. The UC is asked what kind of pain level he has on a scale of 1 to 10 to which he responded about an eight. The UC was asked why he did not have an x-ray taken after his previous visit, to which the UC responded that he had no money for an x-ray, since he had paid $450 for his first visit. The unidentified white female responded that the UC would have to see somebody (rather than just be given a prescription) since he did not have an x-ray. The female stated that the UC should tell her (the next person he would see) why he didn't get an x-ray and that maybe she'd let him slide (give UC a prescription). The UC returned to the waiting area and after waiting approximately two and one half hours he was called into an exam room and seen by an individual believed to be Camille Swanson Helsel.

60. The recorded conversation between the UC and Camille Swanson Helsel was transcribed as follows:

Camille: What are we treating you for? Back pain?

U/C: Yes Mam.

Camille: So this is just your second visit here. How's everything going?

U/C: I'm still a little bit tender, sore.

Camille: Why did you not get the x-ray done that (name not clear) ordered for you last time?

U/C: I didn't have the money.

Camille: Yea, but I'm gonna tell you how the law works, I'm not kidding you, she put you on ninety narcotics a month, if the Feds walk in right now I want them to be able to pick any fucking chart that they want to and I'll either be searching for what's wrong with you or I will have found why I think you need these rather than some Advil or tell you to go to Wal-Mart and tell you to buy some Tylenol.

U/C: I understand.

Camille: So you got to work with me here.

U/C: I understand.

Camille: We gotta get your chart up to date, even though you're a brand new patient so it looks like you've been here one time and you're already being non-compliant.

61. Helsel went on to discuss UC's back pain and the requirement for the UC to get an x-ray. Helsel then told the UC that she would call in his medicine so that it would be ready. Helsel gave the UC a prescription for an MRI and told him that he was done. The UC checked with the receptionist who told the UC that the prescription would be called in to Hurley's. The UC left the WWC, went to Hurley Drug store and obtained ninety Hydrocodone 7.5/500 tablets based on the

"call-in" prescription. The prescription was under the authorization of Dr. Katherine Hoover and is under a "sig" of 1 tablet 3 times per day for pain.

C. October 13, 2005

62. The UC entered the reception area and spoke with the receptionist, an unknown female. The female requested the payment of one hundred and fifty dollars for the visit which was paid by the UC. The UC indicated that he had brought an x-ray with him as requested. The UC was seen by an employee that identified herself as "Mary". (This may be Mary Yates, a nurse at the clinic.) The UC gave the x-rays to Mary and informed her that the doctor who took the x-rays said he couldn't find anything wrong with him. The UC told Mary that his pain in his back is about the same. He also asked Mary for some Xanax to help him with his sleeping. Mary documented the name of the doctor who took the x-ray, and gave the x-ray back to the UC. The UC then went to Family Discount Pharmacy in Mount Gay, West Virginia and filled the call-in prescriptions. The prescriptions consisted of 90 Hydrocodone 7.5/500 and 30 Alprazolam .5mg. The prescription bottles indicated that they had been called in under the authorization of Dr. William Ryckman. The UC had never been seen by Dr. Ryckman.

63. Following this UC visit, phone calls were made to the WWC by a member of the West Virginia State Police. The officer asked the unidentified female who answered the phone if he could speak with Dr. Ryckman. The female indicated that Dr. Ryckman was not in the office that day and that Dr. Chico was at the practice. She added that Dr. Ryckman would not be in anytime that day. During a second call the unidentified female indicated that she thought Dr. Ryckman might be back

at the beginning of the following week but was not sure.

D. November 17, 2005

64. The UC entered the WCC and provides the receptionist with his name, date of birth, and one hundred and fifty dollars. The UC was then called back where he is seen by a female who weighed him and took his blood pressure. She then asked the UC if he smoked or was allergic to any medicine. The UC is then requested the UC to sign a form. The UC informed the female that he would like to pick his medicine up at the same pharmacy as before. The UC responds to the Family Pharmacy in Mount Gay, West Virginia, where he obtained ninety 7.5mg hydrocodone tablets and 30 .5mg Alprazolam tablets pursuant to "call-in" prescriptions from the WWC under the DEA registration and authorization of Dr. Hoover.

E. December 16, 2005

65. The UC entered the WWC and paid the receptionist one hundred fifty dollars and provided his name and date of birth. After a short wait, the UC was taken in to a private room. The UC was seen by a nurse who took his blood pressure. The nurse also asked him, on a scale of one to ten, how much pain he had. The UC said eight. The nurse asks the UC if he was taking any medication, if he was working, or if he smoked. The UC answered, "no", to the questions. The nurse then asked the UC to sign a form pertaining to the questions that were just asked of him. The nurse asked the UC how long it has been since he has seen a doctor. He responds, "twice", meaning two doctor's visits. The UC was told he can pick his medicine up in "Logan", meaning the Family Discount Pharmacy in Logan, West Virginia. (This meeting lasted less than four minutes). The UC then obtained ninety (90) hydrocodone and thirty (30) Xanax from Family Discount Pharmacy in

Logan. The prescriptions were issued under Dr. Ryckman's name and DEA number.

DR. DONALD KISER, D.O.

66. In February 2005, Dr. Donald Kiser D.O. was arrested in Mingo County, on state charges and was later prosecuted federally on charges related to a conspiracy to distribute prescription drugs. In February 2008, Dr. Kiser was sentenced to eighty-seven months in prison. At the time of his initial arrest on the state charges, he was a physician employed at the WWC.

67. On May 29, 2007, Dr. Kiser advised that, in 2004, he had been practicing as an Emergency Room Physician at Williamson Memorial and was recruited by Myra Miller, office manager of the WWC , to go to work at WWC as an independent contractor.

68. Kiser advised that he was paid two thousand dollars ($2,000) a day by WWC for his services. Kiser advised that initially he was responsible for reviewing established patient files and calling in prescriptions. Kiser advised that he would then place patient charts in boxes corresponding with area pharmacies that the practice dealt with for the prescription to be called in. Kiser advised that from reviewing these charts, he noticed that it had been several years since some patients had seen a doctor. Kiser advised that Doctors Hoover's and Ryckman's patient files appeared very limited in detail. Kiser stated that it appeared the WWV was providing prescriptions in exchange for money.

69. Kiser advised that as many as four hundred patients a day were processed through the practice while he was there. Kiser was asked why all the prescriptions were called in as opposed to being written out. Kiser advised that a physician could not physically write out all the prescriptions

due to hand fatigue and it also prevents patients from altering the prescriptions.

70. Kiser advised that the standard of practice for the office for cash payment was to charge a first time fee of three hundred fifty dollars. The patient was then seen by a doctor and established as a patient. Kiser advised that the patient would then choose a pharmacy from a pre-selected list of pharmacies. Kiser advised that generally the patient was to have some sort of an x-ray or MRI conducted before their second visit. Kiser advised that from that point on the patient was to return to the clinic every month, have their vitals taken by a nurse and would only see a doctor if they requested. Kiser advised patients were then charged a lesser amount in cash for each additional monthly visit. He stated he was not certain on the office prices due to him not being involved in the payment procedures. Kiser advised that on one occasion there was no physician on duty at the clinic and he was provided with information to call in prescriptions while he was on duty at Williamson Memorial. He advised that the other physicians (Hoover and Ryckman) did not like him questioning their prescribing habits or methods of treatment. Kiser advised that members of the practice also did not approve of the discharging of patients for substance abuse.

71. Kiser advised that at the time of his employment, Dr. Ryckman ran the clinic and Myra Miller was the office manager. Kiser advised that the other practicing physicians were Dr. Hoover and Dr. Chico. Kiser advised that Dr. Ryckman [who lived in Pennsylvania] would make limited appearances at the clinic. Kiser advised that there were several other nurses or nurse technicians and one nurse practitioner named Camille Helsel. Kiser advised that he questioned Dr. Ryckman and Hoover's practicing of medicine based on chart review and failure to see patients. Kiser advised that the majority of individuals receiving controlled substances are cash patients. Kiser advised that there is a different protocol for patients paying with insurance.

72. Kiser advised that he later became aware that the several rooms at this practice were being monitored by video surveillance. Kiser advised that he observed a money counting machine at the practice and overheard a conversation between Myra Miller and Dr. Ryckman where Ryckman commented, "Why are we paying the accountants if they can not hide the money?"

73. Kiser advised that he was discharged from the clinic after his initial arrest in the beginning of 2005 by Dr. Ryckman through Myra Miller. Kiser advised that he was also told by Myra Miller that with his present charges he had become a "lightning-rod for the feds". Kiser advised that he was later given ten thousand dollars ($10,000) from Dr. Ryckman.

CAMILE HESEL

74. On Wednesday, March 11, 2009, Camille Helsel was interviewed. Helsel advised that she was a nurse practitioner working at the Williamson Memorial Hospital and spoke to Myra Miller about working at the WWC. Helsel advised that she began her employment at the WWC in 2004, after Dr. Donald Kiser had joined the practice. Helsel advised that she was initially paid three thousand dollars ($3,000) a week.

75. Helsel advised that when she first went to work at the clinic the doctors present were: Owner Dr. William Ryckman, Dr. Katherine Hoover, Dr. Donald Kiser and Dr. Eric Chico. Helsel advised that her job was to document and update patient's medical files. Helsel advised that it varied how many physicians would be on duty at a time, but generally it was one physician and some times the physician would only be available by telephone. Helsel advised that the clinic would average about one hundred fifty patients a day. On busy days, they would have as many as three to four

hundred or more patients a day. Helsel advised that the patients were predominately (70%) cash patients and were paying four hundred fifty dollars ($450.00) for a first time patient and one hundred fifty dollars ($150.00) for established patients. Helsel advised that the practice generally only accepted insurance from individuals involved in crashes from KY due to "P.I.P.", which allowed them a guarantee of ten thousand dollars ($10,000.00), a patient. The patients were then referred to the Aquatic Rehab Center across the street until the said amount was exhausted and then the patient became a cash patient returning to the clinic monthly.

76. Helsel advised that she agreed to take over as owner of the WWC in January 2006, after Dr. Kiser's arrest on State charges. She agreed to "pay" Dr. Rykman the previous "owner" $25,000 a month for five years. Helsel then changed the clinic's name to Mountain Medical. The ownership change was also reflected on the West Virginia Secretary of State's website. Myra Miller was listed as a member and the agent for service of process. This change may have been made, at least in part, because of the criminal charges against Dr. Kiser and the fear that the clinic and its owner would be coming under greater scrutiny.

77. Helsel advised that Dr. Hoover was the "bread and butter of the operation" because she would prescribe to anyone thereby generating the largest income for the clinic.

78. Helsel advised that the clinic would average one hundred and fifty and up to four hundred "patients" a day. She advised that with the money generated from the first week of the month, all salaries and overhead for the month could be met. The remaining three weeks' income

was pure profit for the business.

79. Helsel advised that Dr. Hoover used poor documentation when prescribing and she, Helsel, and other nurses had to document the charts to make them appear proper in documentation in the event they were searched by law enforcement. Helsel advised that she and others had brought to Dr. Hoover's attention individuals suspected of diverting or abusing the controlled substances they were being prescribed. Hoover continued to prescribe to those individuals.

80. Helsel advised that usually there was a doctor present at the clinic or was available by telephone.

81. Helsel described the practice as pain management, but indicated that very few schedule II controlled substances are prescribed for treating pain at this practice. Helsel advised that she was aware of other pain management practices that would prescribe mostly schedule II's. Helsel advised that schedule II's would be better for the patients, because of the damage done to the patients' internal organs by the Tylenol in the Hydrocodone. Helsel advised that they do not prescribe schedule II's in order to maintain a low profile and avoid attention from the authorities.

82. Helsel advised that she suspected about half of the patients were either drug addicts or were selling the prescription drugs that they obtained. Helsel advised that about half of the patients might actually need the narcotics prescribed. Helsel advised that pain is subjective and, that, in her opinion, if someone obtains hydrocodone from the clinic and sells it, then that is between that person and law enforcement.

83. Helsel advised that she believed money was being embezzled or misappropriated from the business and that if an investigation was conducted the money generated from this practice could

not be accounted for by the principals. Helsel advised that the cash generated from the business was handled by Myra Miller and employee, Teresa Channels. Helsel advised that money obtained was to be deposited daily at the BB&T Bank in Williamson, West Virginia.

84. Helsel advised that she had no control over the company's finances and that in February 2009, she attempted to pay Dr. Ryckman by check twenty five thousands dollars ($25,000) from the business account and the check did not clear. Helsel advised she later found out that the account had been drained. Helsel advised that as owner she was paid twenty eight thousand dollars a month ($28,000) and her taxes on that money were taken care of by Mountain Medical.

85. Helsel also advised that she always suspected that Dr. Hoover was also obtaining cash from the business based on the fact that Dr. Hoover was being paid just four thousand dollars ($4,000) a week and that salary figure appeared low compared to others salaries and the role that she played in the clinic's operation. Helsel advised that Dr. Hoover stayed in Williamson through the week and traveled back to her home in northern West Virginia on the weekends.

86. Helsel stated that on one occasion, no physician was present at the clinic. She was very busy documenting patient files and noticed that she had completed one hundred fifty (150) patient charts without eating lunch. Helsel advised she also noticed she had three first-time patients. Helsel said she approached Myra Miller, who was speaking to another unknown person about taking a break and was told to get back to work. Helsel advised that she informed Myra that she had seen 150 patients and had three first-time patients waiting. Helsel informed Myra that she was taking a break and walked outside to smoke a cigarette. Helsel advised that she was approached outside by Myra Miller and was told to "not ever fucking discuss numbers of patients in front of anyone else. Don't

you ever do that again!"

87. Helsel advised that Kiser left the practice due to legal issues regarding a criminal matter. Dr. Chico left the pain management side of the clinic due to complaints that he spent too much time with patients and would not agree with Hoovers prescribing practices and was "running" off to many patients. Dr. Chico was refused to write controlled substances to people that he felt did not need them. Helsel advised that Chico kept some of Hoover's files as examples of illegal prescribing acts and threatened to turn the same over to the "feds" if she messed with him.

88. According to Helsel, Dr. Chico was still associated with the clinic but only for drug treatment. (It is believed that Dr. Chico provides Suboxone treatment for opiod addiction at another nearby location. Hydrocodone is an opoid.) Helsel advised that for, a period of time, the only doctor with the clinic was Hoover. Helsel advised that Dr. Teleron came on staff in October of 2008 to oversee Hoover due to an issue with the Medical Board. Helsel advised that she has never seen Teleron.

ANALYSIS OF WEST VIRGINIA BOARD OF PHARMACY

89. According to prescription records from the West Virginia Board of Pharmacy, for the period of December of 2002, until January 25, 2010, Dr. Hoover was the number one prescriber of controlled substances in West Virginia, based upon the number of prescriptions filled under her DEA registration number as reported by pharmacies in West Virginia. Since December 2002, there have been 355,132 prescriptions for controlled substance issued under her DEA number. This figure does not include Dr. Hoover's controlled substance prescriptions filled in Kentucky, which is very close to her Williamson, West Virginia office.

89. Law enforcement contacted the Mountain Medical office anonymously and was informed that "the doors open at 7:00 am and the doctor's window opens at 7:30 am." The officer was also advised that the clinic closes at 4:00 pm every day, Monday through Friday.

90. The West Virginia Board of Pharmacy's database reveals that in 2009, Dr. Hoover had 30,472 unique patient scripts. ("Unique patient scripts" means the number of individuals who filled controlled substance prescriptions under that physician's DEA registration number.) Dr. Teleron had 12,205 unique patients scripts filled under his DEA number in 2009. Dr. Ryckman had 1,176 prescriptions filled under his DEA number. Using the unique patients data described above for Dr. Hoover, Dr. Ryckman, and Dr. Teleron, and assuming that 70% paid at least $150 per visit, Mountain Medical had total revenue intake in 2009 of $4,604,565, in cash. This number is conservative as new patients paid up to $450 per visit and it does not include "P.I.P." income.

FINANCIAL INVESTIGATION

91. On April 28, 2009, Dr. Ryckman opened three accounts XXXXXXXXXX6880; XXXXXXXXXX6899; and XXXXXXXXXX6902, at the BB&T Williamson, West Virginia branch. Teresa Channels, who represented that she worked for Dr. Ryckman, immediately began depositing large amounts of cash into account XXXXXXXXXX6880. The cash deposits occurred on almost a daily basis and were approximately $20,000 each. Between April 28, 2009, and July 24, 2009, $1,009,805, in cash was deposited into account XXXXXXXXXX6880.

92. Your affiant believes that this financial activity corroborates Heslel's being removed as the "owner." It appears that Ryckman opened these new accounts after the old account that was

known to Heslel was closed in February of 2009.

93. On September 1, 2007, Katherine Hoover, residing at [redacted] Lost Creek, West Virginia, purchased a 2007 BMW, Model 335I convertible, VIN #WBAWL73597PX50531, from A&L Motor Sales, located in Monroeville, Pennsylvania, for $53,675. Dr. Hoover paid a $17,000 cash down payment on the vehicle. The balance due on the vehicle was $36,750. The West Virginia Department of Transportation Division of Motor Vehicles provided a DMV-1-TR, Application for a Certificate of Title for a Motor Vehicle, signed by Katherine A. Hoover, [redacted] Lost Creek, Harrison County, West Virginia 25661. The vehicle, a 2007 BMW Model 335I convertible, VIN #WBAWL73597PX50531, is listed as being free and clear of any liens and encumbrances.

94. Your affiant has reviewed wage reports for Mountain Medical Care Center, LLC. Myra Miller earned, from the 1st quarter of 2006 through the 4th quarter of 2008, total wages of $1,163,842.70. William F. Ryckman, MD began paying wages to Myra Miller in the 2nd and 3rd quarter of 2009. Myra Miller received total wages of $193,776.

95. In 2009, West Virginia wage reports for the second and third quarters, for the clinic do not show wages paid to Dr. Hoover. Bank records from account XXXXXX7905 maintained by Dr. Hoover at Wesbanco Bank, Inc., show that Dr. Hoover received fairly regular checks from Dr. Ryckman's BB&T account (XXXXXXXXXX6880) which was associated with the clinic. The checks were signed by Myra Miller. The checks ranged from $2,500 - $5,000. Dr. Hoover also maintained a savings account (XXXXXX3002) at Wesbanco Bank, Inc.

96. Between January, 2006 and May of 2009, a number of the individuals who obtained controlled substance prescriptions under the DEA registration numbers of Dr. Hoover and Dr. Teleron were Medicare beneficiaries. Medicare was a program established and funded by the United States to provide health insurance to the elderly, severalty disabled, or persons with specific chronic medical conditions. As previously indicated, the clinic did not accept Medicare as a form of payment and required at least $150 cash per visit. Some of the Medicare beneficiaries who paid cash to receive controlled substance prescriptions from these doctors used their Medicare benefits to pay $383,452 to pharmacies for the drugs. Medicare would not pay for prescription drugs that were not medically necessary and/or that were not prescribed pursuant to a valid prescription issued in normal course of medical practice. Given the facts outlined above, Medicare was likely defrauded of at least $383,452.00 by the physicians, the employees of the clinic and the beneficiaries who caused that money to be paid to Medicare pursuant to the operation of Mountain Medical.

97. It is your affiant's belief that the physicians and employees of Mountain Medical are operating, and have operated for a period extending five years, what is commonly known as a "pill mill". Physicians seem to have developed a pattern of activity that they believe will protect them from prosecution through their use of x-rays and/or MRIs to document some type of examination being conducted, as well as having the office employees perform a cursory examination at least monthly on each patient. Your affiant believes that the facts contained in this affidavit instead shows a clear history of criminal activity that allows the physicians and employees of Mountain Medical to accumulate large sums of cash, while "seeing" as many patients as possible in as short a time period as possible. Patients that ask to see a physician are forced to sit for an extended period of time, in what your affiant believes is a deterrent to patients who actually want to be treated for

whatever medical ailment they are experiencing. Your affiant has been able to verify the testimony of those involved in criminal activity whose testimony might otherwise be deemed unreliable, through a series of undercover visits by the West Virginia State Police to Mountain Medical, as well as the testimony of others. These practices conducted by Dr. Ryckman and others at the clinic were also substantiated by the action taken against Dr. Ryckman by the West Virginia Board of Medicine in 2004.

98. Your affiant also believes that Mountain Medical's list of local pharmacies for controlled substance prescriptions is an indication of a criminal pattern. It is your affiant's belief obtained through experiences in other health care fraud matters, that physician's operating as "pill mills" will generally only allow their patients to fill their prescriptions at locally owned pharmacies. National "chain pharmacies" such as Rite Aid or Walgreens are staffed with pharmacists who have little or no financial interest in the amount of revenue generated through the sale of controlled substances, in comparison to locally owned pharmacies. Locally owned pharmacies see a direct benefit in filling these controlled substance prescriptions. Therefore, while a pharmacist working at a pharmacy such as Rite Aid may become concerned by the amount of controlled substances being prescribed by a clinic, and would perhaps, take steps to reject such prescriptions and/or alert law enforcement, pharmacists at locally owned pharmacies often turns a blind eye to the clinic's behavior. The physicians working at pill mills realize this and steer their patients towards more agreeable pharmacies.

MOO Management

99. Mountain Medical Care Center, LLC stopped issuing wages to its employees on February 24, 2009. The clinic employees were then paid through a MOO Management, Inc. account until May 1, 2009 when Dr. Ryckman's State of West Virginia Employer Number was established. He then began to pay employees of Mountain Medical using that number. MOO Management, Inc., is a West Virginia company, formed in January of 2006, by Myra C. Miller and John J. Miller. According to the West Virginia Secretary of State Business Organization Information System database, MOO Management terminating its business on June 17, 2008.

COMPUTER DATA

100. From my experience and training in investigating white collar fraud, I know that individuals engaged in crimes such as these often maintain records pertaining to their crimes as well as instrumentalities and fruits of their crimes at their businesses and residences. Often this information is stored on computer systems as well as "hard" physical copies. I know from my training and experience that cellular telephones, computer hardware, software, PDS's, documentation, passwords and data security devices may be important to a criminal investigation in two distinct respects:

A. The objects themselves may be instrumentalities, fruits or evidence of crime; and/or

B. The objects themselves may have been used to collect and store information about crimes (in the form of electronic data).

101. Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks,

magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

A. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

B. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden", erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

C. Typically, the volume of data stored on many computer systems and storage devices will be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer

found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

D. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files. However, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard", is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography". For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

102. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords and data security devices which are (1) instrumentalities, fruits of evidence of crime, or (2) storage devices for information about crime. I also know from my training and experience as an agent that computer storage devices can store the equivalent of thousands of pages of information. When the user wants to conceal criminal evidence, he/she will often store it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.

This sorting process can take weeks or months, depending on the volume of the data stored, and it would be impractical to attempt this kind of data search on site.

103. Furthermore, I know from my training and experience as an agent that searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The wide variety of computer hardware and software available requires even computer experts to specialize in some systems and applications. Consequently, it is difficult to know before a search which expert should analyze the system and its data.

104. In light of this information and these concerns, I hereby request the Court's permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to make mirror images and/or copies of the computer hard drives and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware for this evidence on-site.

Premises to be Searched

A. Mountain Medical Care Center, located at 35 West Third Avenue, Williamson, Mingo County, West Virginia.

b. 114 West Second Avenue, Williamson, Mingo County, West Virginia and the attached building.

c. Katherine Hoover's residence in Lost Creek, Harrison County, West Virginia (to include the main house, the adjacent garage with living space above and three out-buildings/barns).

d. The residence of William F. Ryckman, located at [redacted] Sutersville, Westmoreland, County, Pennsylvania.

e. The residence of Myra C. Miller [redacted] South Williamson, Pike County, Kentucky.

(See photos of each location attached hereto.)

Items to be Seized

105. I know it is important to obtain complete records for patients to whom it is believed controlled substances were unlawfully prescribed and/or dispensed (see complete patient seizure list), as well as any records/documents relating to billing/income, including billing to any government programs such as Medicare and Medicaid as well as financial information including information to show the income and the assets of Mountain Medical's owner's, operators and employees. I submit that those items are set forth in Attachment B to the actual Search Warrant and Search Warrant Application, which is incorporated herein by reference.

CONCLUSION

Based upon the above, I submit that there is probable cause to search the premises described above for the purpose of obtaining evidence of violations of 21 U.S.C. § 846 (conspiracy to distribute controlled substances); 21 U.S.C. § 841(a)(1) (distribution of controlled substances); 21 U.S.C. § 843(a)(2) (use of a registration number issued to another person); 21 U.S.C. § 843(a)(3) (obtaining controlled substances by fraud) and 18 U.S.C. §§ 1347 and 2 (Health Care Fraud and Aiding and Abetting).

And further the affiant saith naught.

M. T. SMITH
Sgt. West Virginia State Police

Taken, subscribed, and sworn to before me this 1ST day of ~~February, 2010~~ MARCH 2010.

HONORABLE JAMES E. SEIBERT
U.S. Magistrate Judge



Entrance to Mountain Medical Care Center, LLC, 35 West Third Ave., Williamson, WV




Attachment A



Frontview 114 West Second Ave., Williamson, WV



Attachment A

Katherine A. Hoover's Residence
Lost Creek, Harrison County, West Virginia



Attachment A

Myra Miller's Residence



Attachment A


Attachment A
Ryckman Residence